## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**SHARLENE PARKER**                                    **CIVIL ACTION**

**VERSUS**

**STATE OF LOUISIANA DEPARTMENT**
**OF EDUCATION SPECIAL SCHOOL**                        **NO. 07-369-C-M2**
**DISTRICT**

## <u>NOTICE</u>

Please take notice that the attached Magistrate Judge's Report has been filed with the Clerk of the United States District Court.

In accordance with 28 U.S.C. § 636(b)(1), you have 10 days from the date of service of this Notice to file written objections to the proposed findings of fact and conclusions of law set forth in the Magistrate Judge's Report.  The failure of a party to file written objections to the proposed findings, conclusions, and recommendation contained in a Magistrate Judge's Report and Recommendation within 10 days after being served with a copy of the Report shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions of the Magistrate Judge that have been accepted by the District Court.

**ABSOLUTELY NO EXTENSION OF TIME SHALL BE GRANTED TO FILE WRITTEN OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT.**

Signed in chambers in Baton Rouge, Louisiana, May 12, 2008.

**MAGISTRATE JUDGE CHRISTINE NOLAND**

## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**SHARLENE PARKER**                                    **CIVIL ACTION**

**VERSUS**

**STATE OF LOUISIANA DEPARTMENT
OF EDUCATION SPECIAL SCHOOL**                **NO. 07-369-C-M2**
**DISTRICT**

## MAGISTRATE JUDGE'S REPORT

This matter is before the Court on the Motion for Summary Judgment (R. Doc. 30) filed by defendant, the Louisiana Department of Education, Special School District ("the DOE"), and the Motion to Deny Motion for Summary Judgment or Defer Ruling on Same under Fed. R. Civ. P. 56(f) (R. Doc. 31) filed by plaintiff, Sharlene Parker ("Parker").  While Parker's motion to deny/defer has been pending, she has filed an opposition to the DOE's summary judgment motion (R. Doc. 32), and both parties have filed reply memoranda relative to the DOE's  motion.  (R. Docs. 38 and 40).

## FACTS & PROCEDURAL BACKGROUND

Parker filed this suit on May 28, 2007.  In her original complaint (R. Doc. 1), she alleges that this is a "civil action arising under the laws of the United States, particularly 42 USC 2000e, et seq."  She further alleges that she is an African-American who was employed by the DOE from November 8, 2004 through June 23, 2006, as a special education teacher at Dixon Correctional Institute ("DCI").  She avers in a conclusory fashion that the DOE "created a hostile work environment based upon [her] race" and "fired [her] unlawfully based upon her race."  As a result of the DOE's alleged actions, Parker contends that she suffered damages, including lost income and benefits, emotional distress,

humiliation, mental anguish, anxiety, and other damages.  She also seeks punitive damages and attorney's fees.

In response to Parker's original complaint, the DOE filed a motion to dismiss, or in the alternative, a motion for more definite statement.  (R. Docs. 8).  Parker then filed an amended complaint (R. Doc. 10), supplementing her original allegations.  The DOE filed a second motion to dismiss or for more definite statement (R. Doc. 15) relative to Parker's amended complaint on August 21, 2007.  On August 23, 2007 and January 9, 2008, the undersigned recommended that both of the DOE's motions to dismiss be denied since Parker's original and amended complaints presented sufficient allegations to put the DOE on notice as to her hostile work environment and retaliatory discharge claims.  (R. Docs. 21 and 27).  Such recommendations were adopted by the District Judge on September 18, 2007 and February 7, 2008.  (R. Docs. 23 and 29).

In her amended complaint, Parker alleges the following facts:  On February 20, 2006, Parker and one of her African-American co-workers, Kanisha Jimison ("Jimison"), met with Parker's immediate supervisor, Roger James ("James"),[1] and another of her supervisors, Anne-Marie Leblanc ("Leblanc"),[2] both of whom are white, to question them about preferential treatment that a white co-employee had been receiving.  Specifically, Parker and Jimison complained that they were expected to complete work that was assigned to a white employee, Carla Bigham ("Bigham"), and that they were required to

---

[1] James was the DOE's Education Program Consultant.  *See*, R. Doc. 30-4.

[2] Leblanc was the DCI's Education Director, who was responsible for all inmate education and training programs at the DCI facility.  *See*, R. Doc. 30-4.  According to evidence presented herein, although Leblanc technically was not Parker's supervisor because she was not employed by the DOE, she had responsibility over all teachers at DCI, including Parker, and they therefore "accounted to" her.  *See*, R. Doc. 32-6, p. 8; R. Doc. 30-4.

"walk through a line-up of prisoners," which the white employee was not required to do. Parker contends that her supervisors became "upset" during that meeting and told Jimison to "shut up."

Parker also alleges that, on March 20, 2006, she met with James and Leblanc again and was told at that time that she would have to move her classroom to another building, where the classroom would be shared by both regular education inmates and Parker's special education inmates.  Parker contends that she tried to question James about the legality of special education students being housed with regular education students and asked him to put in writing his instruction about moving classrooms.  She asserts that Leblanc "kept interrupting" her during that meeting to advise that she felt Parker was "being insubordinate" by asking her questions.  Parker alleges that she asked James to meet with her privately, but he refused.

On March 21, 2006, Parker allegedly reported for work but then left in order to attend a scheduled training class.  Upon returning to work on March 24, 2006, Parker found that her materials had been moved to Leblanc's office, and according to Parker, security personnel told her that she was not allowed into the office unless Leblanc was present. Parker contends that she was therefore unable to get to her materials to complete a lesson plan that James expected to receive on March 24, 2006.  Parker alleges that, although she sent James a request for an extension, explaining why she could not timely complete the lesson plan, James refused to accept that request because it was not faxed from Leblanc's fax machine in accordance with a prior directive of James.

Finally, Parker contends that, following a meeting in Leblanc's office on March 31, 2006, she inadvertently left her security beeper, which had been issued to her by the

3

facility, on Leblanc's desk.  According to Parker, in her experience, whenever a beeper was found, security personnel simply returned it to the teacher.  However, she alleges that, when security personnel advised Leblanc that the beeper belonged to Parker, Leblanc said she "would take care of it."  Later, the security guard claimed to have found the beeper in the "teacher's planning area," to which inmates have access and which is right next to Leblanc's office.  According to Parker's amended complaint, the security guard "wrote [her] up" for the beeper incident and banned her from the facility, asserting that she posed a security threat.[3]  Because Parker was unable to report to work due to the ban, she was placed on administrative leave by the DOE from April 4, 2006 through June 23, 2006, while an investigation was to be conducted in the matter.  When the ban was not lifted, she was terminated on June 23, 2006.  She contends that the DOE never conducted an investigation and that she was never contacted by the DOE about the reported incidents prior her termination.

On March 14, 2008, the DOE filed the present motion for summary judgment.  In that motion, the DOE contends that Parker's suit should be dismissed on the following grounds: (1) her hostile work environment claim is insufficient as a matter of law; (2) her reports of alleged harassment by the DOE did not cause her termination; (3) she failed to exhaust her administrative remedies; (4) she failed to report the alleged harassment to the DOE in accordance with its policies; and (5) punitive damages are not available in suits against a state entity, such as the DOE.  The DOE also asserts that it is entitled to an award of

---

[3] In her affidavit submitted in opposition to the present motion, Parker contends that Jimison and another of her co-workers, Judith Andrews, previously left their beepers unattended, and neither of them were disciplined.  *See*, R. Doc. 32-7.

4

attorney's fees if it prevails on its present motion, pursuant to 42 U.S.C. §2000e-5(k).  In her opposition to the DOE's summary judgment motion, Parker concedes that punitive damages are unavailable against the state and withdraws that claim for relief; however, she asserts that all of the DOE's other arguments lack merit.  In her Rule 56(f)  motion, she contends that the Court should deny/defer ruling upon the DOE's summary judgment motion until she has had the opportunity to depose Cline Jenkins ("Jenkins"), State Director of the Special School District ("SSD"), and DCI Deputy Warden, Janet Lorena ("Deputy Warden Lorena"), because such deposition testimony will reveal genuine issues of material fact concerning her hostile work environment and retaliatory discharge claims.

## LAW & ANALYSIS

**I.      Summary Judgment Standard:**

Summary judgment is appropriate where the pleadings, discovery products, and affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  Fed. Rule Civ. Proc. 56(c).  A "genuine issue" exists when a reasonable jury could resolve the disputed fact(s) in favor of the non-movant, and a "material" fact is one that might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).[4]  Only if the nonmoving party sets forth specific facts and evidence supporting the allegations essential to his/her claim will a genuine issue of material fact be found to exist.  *Celotex Corp. v.*

---

[4] In reviewing a motion for summary judgment, a court " . . .must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh evidence."  *Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 2110, 147 L.Ed.2d 105 (2000).

*Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).[5]

## II.    Is Parker's hostile work environment claim sufficient as a matter of law?

To prevail on a Title VII race discrimination hostile work environment claim, an employee must prove:  (1) that he or she belongs to a protected group; (2) that he or she was subjected to unwelcome harassment; (3) that the harassment was based on a protected characteristic; and (4) that the harassment affected a term, condition, or privilege of employment.  *Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003).[6]  The U.S. Supreme Court has emphasized that Title VII's prohibition in hostile work environment cases is "not limited to 'economic' or 'tangible' discrimination."  *E.E.O.C. v. WC&M Enterprises, Inc.*, 496 F.3d 393, 399 (5th Cir. 2007), quoting *Meritor Savings Bank FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).  Rather, "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated."  *Id.*, quoting *Harris Forklift Sys.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

For harassment to be "sufficiently severe or pervasive to alter the conditions of the victim's employment," the conduct complained of must be both objectively and subjectively offensive.  *Id.*  Thus, not only must the victim perceive the environment as hostile, the

---

[5] The nonmoving party may not rely upon pleadings, conclusory allegations, unsubstantiated assertions or arguments alone, but instead must come forward with evidence based on personal knowledge that demonstrates the existence of a material fact.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  If the record taken as a whole does not lead a rational trier of fact to find for the non-moving party, no genuine issue of material fact exists, and the mover is entitled to summary judgment as a matter of law.  *Id.*

[6] It is undisputed in this matter that Parker is a member of a protected group, the African-American race.

6

conduct must also be such that a reasonable person would find it to be hostile or abusive. *Id.* To determine whether the victim's work environment was objectively offensive, courts consider the "totality of the circumstances," including: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance. *Id.*

In its present motion, the DOE contends that Parker's hostile work environment claim is insufficient as a matter of law because the alleged actions taken by the DOE were not sufficiently severe and pervasive and did not constitute "ultimate employment decisions" or "adverse employment actions" for purposes of Title VII. As discussed above, Parker contends that she was subjected to a hostile work environment based upon the following alleged acts: (1) she and an African American co-worker were assigned to complete work tasks for a Caucasian employee, Bigham; (2) that they were forced to walk through a prisoner line-up, while Bigham was not;[7] (3) that Parker was told she was being "insubordinate" and her co-worker, Jimison, was told to "shut up" when they complained during meetings with James and Leblanc; (4) that her teaching materials were moved to her supervisor's office, such that she could not get to them to complete a lesson plan assignment; and (5) that she was placed on administrative leave and ultimately fired when

---

[7] In an affidavit attached to her opposition to the present summary judgment motion, Parker also contends that she and Jimison were expected to escort Bigham on the prison grounds because Bigham had not received mandatory orientation training, and they were instructed to complete Bigham's entire evaluation packet; to go with Bigham to the nurse's station to collect data on inmates; and to attend sessions with Bigham when she was working with inmates. Parker contends that, while she was performing those tasks for and/or with Bigham, her own work was "falling further and further behind." She asserts that she was asked to perform those tasks with and/or for Bigham because Bigham had expressed to James and Leblanc that she was afraid and not comfortable working with inmates alone. *See*, R. Doc. 32-7.

she inadvertently left her beeper in her supervisor's office, while other beepers which were found were simply returned to their owners.

While it is true that isolated remarks, such as Parker being told that she was being "insubordinate" and Jimison being told to "shut up,"[8] are insufficient, on their own, to support a hostile work environment claim, the issue before the Court is whether or not that conduct, in combination with the other actions alleged by Parker, is sufficient to sustain such a claim.  Furthermore, although the DOE is correct in its assertion that the assignment of additional and/or more difficult/unfavorable work duties does not constitute an "ultimate employment decision" or "adverse employment action" for purposes of a racial discrimination claim,[9] the Court need not find that an "ultimate employment decision" or "adverse employment action" occurred for purposes of a hostile work environment claim. The Court need only find that an action or pattern of actions by the DOE was sufficiently

---

[8] *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275 (1998), quoting *Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971)("[M]ere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not sufficiently alter terms and conditions of employment to violate Title VII); *Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1271-1272 (7th Cir. 1991); *Davis v. Monsanto Chemical Co.*, 858 F.2d 345, 349 (6th Cir. 1988); *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2nd Cir. 1986); 1 B. Lindemann & P. Grossman, Employment Discrimination Law 349, and nn. 36-37 (3d ed. 1996)(citing cases instructing that "[d]iscourtesy or rudeness should not be confused with racial harassment" and that a "lack of racial sensitivity does not, alone, amount to actionable harassment"); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

*See also, Maddin v. GTE of Fla., Inc.*, 33 F.Supp.2d 1027 (M.D.Fla. 1999)(Holding that placing a hand over a plaintiff's face and telling her to "shut up" did not amount to severe or pervasive harassment); *Lee v. Potter*, 2007 WL 4463485 (E.D. Cal. 2007)(holding that the statement, "Shut up, nigger. Go move that mail," did not demonstrate the existence of a hostile work environment).

[9] *Lawrence v. Wal-Mart Stores, Inc.*, 236 F.Supp.2d 1314 (M.D.Fla. 2002)(African-American employee's alleged receipt of increased work assignments after he complained of a supervisor's racial comments was not an "adverse employment action," as required for an employee's prima facie case of retaliation under Title VII); *McGuire v. Miami-Dade County*, 418 F.Supp.2d 1354 (S.D. Fla. 2006)(Increased workloads are not adverse employment actions but rather "an 'ordinary tribulation of the workplace' for which employees should expect to take responsibility"); *Canady v. Klaiber*, 2007 WL 81858 (N.D. Ohio 2007)("The plaintiffs' allegations of undesirable or more difficult work assignments does not constitute an adverse employment action as a matter of law where there is no change in the terms of conditions of employment); *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).

severe or pervasive to *alter the conditions* of Parker's employment.  The assignment of additional and unfavorable work tasks can certainly alter the conditions of an individual's employment, particularly where there is evidence that the employee's own work suffers as a result of having to perform the additional work tasks.

**(A)    Parker's evidence relative to her hostile work environment claim:**

The problem with Parker's hostile work environment claim, however, is that she has not produced any *competent* summary judgment evidence (and jurisprudential support) demonstrating that the alleged pattern of conduct by the DOE was racially-motivated and severe and pervasive enough to carry her burden of proof under Title VII.  The only evidence Parker has produced that actually supports her claim is her own self-serving allegations in her complaints and affidavit in this matter.  The Fifth Circuit Court of Appeals has routinely recognized that unsubstantiated assertions in an employment discrimination plaintiff's affidavit do not constitute *competent* summary judgment evidence.  *See, Grimes v. Texas Department of Mental Health and Mental Retardation*, 102 F.3d 137 (5th Cir. 1996), citing *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994).[10]  Aside from the unsubstantiated assertions in her affidavit, Parker has not produced any evidence as to the specific nature and extent of the

_____

[10] *See also, Douglass v. United Services Automobile Assoc.*, 79 F.3d 1415, 1429 (5th Cir. 1996)(en banc)("[C]onclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden); *Grizzle v. travelers Health Network, Inc.*, 14 F.3d 261, 268 (5th Cir. 1994)(An employee's self-serving generalized testimony stating her subjective belief that discrimination occurred "is simply insufficient to support a jury verdict in the plaintiff's favor"); *Krim v. Banc-Texas Group, Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993)("Summary judgment, to be sure, may be appropriate, even in cases where elusive concepts such as motive or intent are at issue, . . . if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation"); *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994)(en banc)(It is incumbent upon the non-moving party to present evidence- not just conjecture and speculation- that the defendant retaliated and discriminated against plaintiff on the basis of her race).

additional tasks she was allegedly required to perform for Bigham, how often those tasks were performed, and how performing such tasks interfered with her own work performance. Without such information, the Court cannot find that a genuine issue of material fact exists as to whether such additional tasks were "sufficiently severe and pervasive" to be considered hostile or abusive by an objective, reasonable person.[11]  Furthermore, Parker has not produced any competent evidence supporting her assertion that the DOE's alleged pattern of conduct was motivated by her race.

Although Parker has submitted with her opposition excerpts from the depositions of DCI Deputy Warden Lorena; of Leblanc; of State Director of SSD, Jenkins; and of James, such deposition excerpts do not substantiate the allegations in her affidavit and complaints. For example, the excerpts from Deputy Warden Lorena's deposition simply indicate that the decision to ban Parker from the DCI facility was made by Lorena, after speaking with the head warden of DCI, because leaving a beeper unattended in a place to which inmates have access presented a security threat to the institution.  *See*, R. Doc. 32-3, p. 13-16. Lorena indicated that it can be standard practice to institute such a ban without an investigation based upon a factual report where a security threat is found to exist.  *Id.*, p. 14-15.  She testified that the decision to ban Parker was based upon a written "Unusual

---

[11] Parker was made clearly aware of the Court's need for this evidence through the undersigned's January 9, 2008 Report and Recommendation, wherein it was explained:

> [T]he Court is entitled to additional information regarding *the type, amount, and difficulty of the work tasks Parker was required to complete for the Caucasian employee; the frequency of and circumstances surrounding the prisoner line-up abuse; and whether any other employee had ever been placed on administrative leave based upon a security beeper incident.*

*See*, p. 8, R. Doc. 27.

Occurrence Report" and an oral report by Leblanc. *Id.*, p. 13. There is no indication from Lorena's testimony that the decision to ban Parker from DCI was, in any way, related to her race. Furthermore, because the decision to ban her from the facility was made by the DCI wardens, and not by the DOE, such decision cannot be viewed as part of a pattern of harassing conduct by the DOE.[12] Accordingly, Lorena's testimony lends no support to Parker's hostile work environment claim.

Similarly, the excerpt from Leblanc's deposition does not substantiate Parker's claims of a severe and pervasive pattern of conduct by the DOE based upon her race. Leblanc testified that, during the March 20, 2006 meeting, she and James told Parker to move her classroom because space was an issue at the prison. *See*, R. Doc. 32-4, p. 38-39. They told her that her special education classes would have to share space with regular education inmates, and Parker questioned the legality of such space-sharing. *Id.* Leblanc testified she told James that Parker was being "insubordinate" because Parker refused to follow Leblanc's directive to move her classroom. *Id.* Leblanc further indicated that several days passed between the time that Leblanc initially told Parker to move her classroom and the March 20, 2006 meeting. During that meeting, Parker informed James and Leblanc that, if they wanted her classroom moved, they would have to move it. *Id.*, p. 40. Because Parker refused to move her class materials, her supervisors had them moved to Leblanc's office so that they would be secure. *Id.*[13] Leblanc also testified that, while Parker's materials were locked in her office, Parker could have obtained access to them

---

[12] Although Parker contends that she left her beeper in Leblanc's office, rather than in the "teacher planning area," she has not produced any evidence, beyond her own word, to support that contention.

[13] According to Leblanc, it was not until Parker's materials had been moved into the new classroom for her that she asked that her new classroom be painted. *Id.*, at 41.

because security had a key.  Leblanc had no knowledge of whether Parker was denied access to her office by security and specifically testified that she never gave security an order to deny Parker access.  *Id.*, at p. 42-43.  Leblanc further indicated that she does not recall lesson plans having to be faxed from her office.  *Id.*, at p. 44.  Relative to the "legal concerns" that Parker expressed concerning the sharing of space by regular and special education inmates, Leblanc testified that she was informed by James and Jenkins of the DOE that there were no legal issues in that regard.  *Id.*, at p. 51-52.

As to the beeper incident, Leblanc testified that, when the beeper was found, she made an effort to find Parker, but Parker had left for the day.  *Id.*, at p. 50.  Additionally, Leblanc testified that she completed the "Unusual Occurrence Report" relating to the beeper incident.  Such report included the facts relating to the incident and did not need to contain a statement as to whether the incident presented a "dangerous or life-threatening situation."  She, however, testified that she believes the beeper incident did present a security threat because an inmate could have taken the beeper and created a "diversion" with it.  *Id.*, at p. 52-56.  None of the above testimony by Leblanc establishes that the decision to move Parker's classroom, the reference to Parker as being "insubordinate," or the ban instituted relative to the beeper incident were related to Parker's race.  Furthermore, considering the legitimate reasons for such actions articulated by Leblanc, the actions do not appear hostile or abusive.  Parker has not presented any competent evidence to refute those articulated reasons.

The excerpts from Jenkins' deposition submitted by Parker indicate that he had no authority to hire or fire DOE employees and that such authority rested with School Superintendent Cecil Picard.  *See*, R. Doc. 32-5, p. 5-7.  Jenkins could, however,

recommend termination decisions and discuss them with Superintendent Picard and his staff. *Id.*, p. 8. Jenkins indicated that, only in some cases, should an employee who has been placed on special leave for exigent circumstances be contacted to obtain their perspective on incidents that have been reported. *Id.*, p. 35-36. The decision whether to contact that employee depends upon the type of situation/incident involved and the type of employee (*i.e.*, whether he or she is a classified or unclassified employee, and whether his or her employment status is permanent or probationary).[14] *Id.*, p. 36. The situation involving Parker had risen to a "serious level" where the DCI Warden indicated Parker would "not be taken back." *Id.* Parker was a probationary employee because she had only been employed as a teacher with the DOE since November 2004. *See*, R. Doc. 30-4. Jenkins' testimony suggests that Parker's situation may have been one where contacting the employee during the course of an investigation may not have been required; however, he indicated that he is not aware of whether anyone, such as James, may have contacted Parker during the investigation of the incidents related to her. *See*, R. Doc. 32-5, p. 48.

Jenkins also testified that an investigation was conducted relative to the beeper incident and relative to Parker's refusal to move her classroom because such incidents raised "security concerns." *Id.*, p. 46-47. Such investigation involved a meeting of the SSD Disciplinary Committee, where they reviewed information relative to the incidents and made a recommendation as to what should be done – in Parker's case, termination. *Id.*, p. 48-49. Jenkins also testified that he spoke with James and Leblanc during the course of the

---

[14] Employment as a teacher for the DOE is on a probationary basis for the first three (3) years. *See*, James' affidavit, R. Doc. 30-4. Pursuant to La. R.S. 17:45, during the probationary term, the State Board of Elementary and Secondary Education "may dismiss or discharge any probationary teacher upon the written recommendation of the superintendent or other head or director of the special school accompanied by valid reasons therefor.'

13

investigation, and they all "looked into the matter" together.  *Id.*, p. 50.   During the investigation, Jenkins gathered additional materials regarding Parker, including her training records and the DPS&C training manual to ensure that she was properly trained and to look for any policy concerning beepers.  He did not recall finding a written policy concerning beepers.  *Id.*, p. 54-56.   Thus, despite Jenkins' testimony being presented by the plaintiff as alleged support for her claims, such testimony actually refutes Parker's allegations that no investigation was conducted relative to the incidents involving her and that she was fired based upon her race.  The plaintiff relies heavily upon the fact that no formal investigation with interviews was conducted prior to her termination; however, she has not pointed to any evidence requiring such a formal investigation prior to termination, nor has she demonstrated that the failure to conduct such an investigation necessarily indicates that her termination was based upon her race.

Finally, James' testimony provides no support for Parker's claims and actually substantiates the DOE's argument that movement of Parker's classroom was based upon the DCI's right to place staff according to institutional needs, rather than upon retaliation against Parker due to her complaints of preferential treatment of a white employee.  James testified that, in response to Parker's concerns about the legality of regular and special education students sharing space, he sent a memorandum clarifying the function of the DOE/SSD sites within the overall prison system.  *See*, R. Doc. 32-6, p. 45-46.   Such memorandum confirmed that, in the prison system, the locale of instruction is determined by the facility in collaboration with SSD.  James further testified that, in the prison setting, the DOE is exempt from full provision of the legal requirements of "FAPE," and special and regular education students may therefore share space in that setting.  *Id.*, p. 47-49.   He

14

also testified that Parker refused to move her classroom materials when asked, even when assistance was offered to her. *Id.*, p. 49-51.  James indicated that he had never heard of any incidents involving a beeper being left unattended prior to the incident involving Parker. *Id.*, p. 59-60.  Lastly, he testified that he would have generally been a part of discussions with the DOE regarding the incidents involving Parker since he supervised her. *Id.*, p. 63.

      **(B)**    **The DOE's evidence relative to Parker's hostile work environment claim:**

In contrast to Parker's failure to submit competent evidence supporting her hostile work environment claim, the DOE has submitted affidavits by James, Leblanc, and Deputy Warden Lorena, which are consistent with their deposition testimony and which indicate that the DOE's alleged actions were based upon factors other than Parker's race.  For example, according to James' affidavit, the decision to have Parker move her classroom was made, not by the DOE, but by DCI prison officials because the trailer in which Parker conducted her special education classes was going to be used for a new program. *See*, R. Doc. 30-4.  By a memorandum dated March 14, 2006, *all instructional staff* at DCI, including Parker, were notified of the upcoming move and advised that the DCI Education Director, Leblanc, would be responsible for assigning teachers to classrooms.[15]  According to James' affidavit, Parker was adverse to the move to the new classroom because it would have to be shared with regular education students, which she falsely believed to be a legal violation.  R. Doc. 30-4.

In Leblanc's affidavit, she attests to the fact that she met with Parker on March 20,

---

[15] The memo explained that, while consultation with James of the DOE/SSD was customary, the DCI facility maintained the right to place staff according to institutional needs, and all SSD instructional staff were to comply with the letter and intent of institutional policy concerning the maintenance of effective security in all facility environments, including the classroom.  *Id.*; R. Doc. 30-10.

2006 to discuss the move of her classroom, and Parker responded that such a directive had to come from her supervisor, James.  Leblanc reminded Parker of the March 14, 2006 memorandum which made clear that Leblanc was responsible for the assignment of teachers to classrooms.  *Id.*  However, according to Leblanc, Parker responded that, since that memo had not been prepared by James, it had no effect on her.  Leblanc picked up the phone to contact James so that Parker could "straighten things out with him;" however, Parker stood up at that point and walked out of Leblanc's office, claiming it was her break time.  *Id.*

Both Leblanc and James attest that, on March 21, 2006, James came out to DCI, and together, they met with Parker, at which point James instructed Parker to move out of the trailer and into the new classroom by that afternoon.  According to Leblanc and James, Parker refused to move to the new classroom, stating that Leblanc was not her supervisor and therefore did not have the authority to tell her which classroom to use.  *Id.*  James informed Parker of the close working relationship between the DOE and DCI and that Leblanc was responsible for all educational programs at DCI.  James also advised Parker that he could have her belongings moved if she would not do so.  *Id.*  While Parker was out on leave on March 22 and 23, 2006, inmates moved her teaching supplies, equipment, and student records out of the trailer and into Leblanc's office.  *Id.*  Again, there is no indication, based upon the *competent* evidence presented herein, that the decision to move Parker's classroom was, in any way, motivated by her race.  Such decision was based upon an internal facility determination to move special education programs to a new classroom, and Parker's materials were moved because she refused to comply with the facility's decision.  Furthermore, any reference to Parker as being "insubordinate" during the March 20, 2006

16

meeting with Leblanc and James appears to have been motivated not by her race, but by her refusal to follow the directives of her supervisors by moving her classroom.

As to Parker's allegation that she was prevented from completing her lesson plan on March 24, 2006 because her materials had been moved into Leblanc's office and she could not obtain access to that office, Leblanc's affidavit, like her deposition testimony, indicates that Parker was not denied access to her office, as Parker could have obtained access through security. *Id.* Furthermore, Leblanc explains that, if Parker had complied with her supervisors' directives to move her equipment and materials into the new classroom on March 20, 2006 (when initially directed by Leblanc to do so) or on March 21, 2006 (when James offered her assistance to do so), she would have had access to her computer and materials and could have timely completed her lesson plan. *Id.* Thus, it appears that Parker was prevented from completing her lesson plan, not as a result of racial discrimination, but because she failed to follow her supervisors' instructions. Parker has not produced any competent evidence demonstrating to the contrary.

Relative to Parker's contention that she had to perform tasks for and escort Bigham throughout the prison, Leblanc's affidavit explains that such additional tasks were not required of Parker because of her race but instead because, Bigham, who was a temporary employee of DCI following Hurricane Katrina (who had only been to DCI five times and had not yet attended orientation training), was required to be accompanied at all times by an employee who had completed orientation training. *Id.* Again, Parker has not produced any competent evidence demonstrating to the contrary. Finally, as to the security beeper incident, both Leblanc and James explain in their affidavits that Parker's beeper was not simply returned to her because it was left in an area which was fully accessible to inmates,

17

and such incident therefore created a serious security breach which was reported to Deputy Warden Lorena. *Id.* Although Parker asserts in her affidavit and complaints in this matter that two other employees previously left their beepers unattended and the beepers were simply returned to them, she has presented absolutely no evidence to substantiate that assertion and to demonstrate that her beeper was not returned to her as a result of her race.

Accordingly, because Parker has failed to establish, through competent summary judgment evidence, that the alleged pattern of conduct by the DOE was sufficiently pervasive and severe to be considered hostile and abusive by an objectively reasonable person and that any of the actions allegedly taken by the DOE were motivated by her race, the Court finds that her hostile work environment claim should be dismissed.

**III.  Did Parker's reports of the alleged harassment/discrimination in February 2006 cause her termination on June 23, 2006?**

In this argument, the DOE contends that Parker cannot prove the causation element of her retaliatory discharge claim[16] because four (4) months elapsed between the time she reported the DOE's alleged harassing conduct to James and Leblanc during a meeting on February 20, 2006 (*i.e.*, the "protected activity" under Title VII), and the date she was terminated, on June 23, 2006.  In support of that argument, the DOE relies upon a number of cases where it has been held that a lapse of three (3) to four (4) months between reports of harassing conduct and discharge is too long to allow an inference of causation.  *See, Thomas v. Atmos Energy Corp.*, 223 Fed. Appx. 369, 378 (5th Cir. 2007), quoting *Clark*

---

[16] To prove a retaliatory discharge claim, Parker must produce evidence establishing the following elements:  (1) that she engaged in an activity protected by Title VII; (2) that an adverse employment action occurred; and (3) that a causal link exists between the protected activity and the adverse employment action.  *Washburn v. Harvey*, 504 F.3d 505 (5th Cir. 2007); *Dollis v. Rubin*, 77 F.3d 777, 781 (5th Cir. 1995).

*County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001).[17]  As explained in the undersigned's January 9, 2008 Report and Recommendation, however, the causal connection element of a prima facie case of retaliation need not necessarily be proven by the close temporal proximity of the protected activity and the retaliatory conduct.  *See*, R. Doc. 27, p. 11, citing *Marx v. Schnuck Markets*, 76 F.3d 324 (10th Cir. 1996).  Where a close temporal proximity does not exist, the plaintiff may offer other evidence to establish causation.  *Id.*, citing *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001), Citing *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390 (10the Cir. 1997)("Unless the termination is very closely connected in time to the protected conduct, the plaintiff will need to rely on additional evidence beyond mere temporal proximity to establish causation").

In her opposition to the present motion, Parker contends that she has set forth a prima facie showing of causation because, shortly after the protected activity (*i.e.*, the February 20, 2006 meeting with Leblanc and James), a pattern of retaliatory conduct began that was apparently related to the protected activity even though she was not terminated until much later.  *See, Marx v. Schnuck Markets*, 76 F.3d 324 (10th Cir. 1996)(The temporal proximity analysis must not be applied too restrictively where a pattern of retaliatory conduct begins soon after the protected activity and only culminates later in actual discharge).  Parkers argues that, after she expressed complaints to her supervisors on February 20, 2006, the following pattern of retaliatory conduct began and ultimately

---

[17] *See also, Ajao v. Bed Bath and Beyond Inc.*, 2008 WL 345505, *6-7 (5th Cir. 2008); *Campbell v. England*, 2007 WL 1454542, #4 (5th Cir. 2007); *Wascura v. City of S. Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001); *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992); *McGuire v. Miami-Dade County*, 418 F.Supp.2d 1354, 1362 (S.D. Fla. 2006).

concluded in her termination:  (1) She was required to move her classroom in a manner that raised legal concerns and which ignored her expressed concerns; (2) She was told she was "insubordinate" for asking questions; (3) Her supervisor, James, refused to meet with her privately (without Leblanc) to discuss the movement of her classroom; (4) Her class materials were moved into Leblanc's locked office, making it impossible for her to complete her lesson plan on time; (5) The fax of her lesson plan was arbitrarily refused because it did not come from a particular fax machine located in Leblanc's office; (6) It was claimed that her beeper had been left in an area accessible to inmates when it had not been; and (7) She was disciplined for the beeper incident even though there is no written policy regarding beepers and even though others have left beepers unattended without discipline. Parker further contends that, although the DOE did not formally terminate her employment until June 23, 2006, it placed her on administrative leave on April 4, 2006, only forty-three (43) days after her complaints on February 20, 2006.

The problem again with plaintiff's assertions relative to causation is that she has presented no *competent* evidence to substantiate the conclusory contention that the above alleged actions by the DOE resulted from her complaints about preferential treatment for a white employee on February 20, 2006.  As discussed in the previous section of this report, the affidavits and deposition testimony of James, Leblanc, and Deputy Warden Lorena indicate that the various actions alleged above were taken for legitimate reasons other than Parker's race, and Parker has not submitted anything other than her self-serving

affidavit to refute their attestations.[18]  Furthermore, the evidence that Parker has presented

indicates that the decision to ban her from the DCI facility was not even made by the DOE

and was instead made by Deputy Warden Lorena for legitimate security reasons.  Such

ban prevented Parker from teaching at the DCI facility and, according to the deposition

testimony presented herein, resulted in her ultimate termination since it was based upon

security concerns.[19] [20]  Accordingly, Parker has not carried her burden of proving that her

termination on June 23, 2006 was caused by her complaints of harassment on February

20, 2006.

Additionally, the fact that the DOE placed Parker on paid, administrative leave on

April 4, 2006, only forty-three (43) days after her February 20, 2006 complaints, does not

_____

[18] For example, according to the evidence submitted by the DOE, the requirement that Parker
move her classroom was a directive to *all SSD employees* based upon an institutional decision by DCI.
The reference to Parker as being "insubordinate" resulted from her failure to comply with the directives of
her supervisors.  The movement of her class materials resulted from her refusal to do so herself and from
her own statement to James and Leblanc that, if they wanted her materials moved, they would have to do
it themselves.  There is no competent evidence that Parker was denied access to Leblanc's office to
complete her lesson plans; that Leblanc ordered security not to allow Parker access to her office; that a
directive was ever actually issued by James requiring that lesson plans be faxed from Leblanc's office; or
that Parker sent a written request for an extension of the deadline to submit her lesson plan, which was
refused by James.  Finally, Parker has not come forward with proof that the DOE failed to comply with any
policy concerning beepers; that a written policy concerning beepers was required; or that any prior, similar
beeper incidents occurred and/or were handled differently.

[19] Although the fact that Parker was banned from the DCI facility did not necessarily mean that
she had to be terminated as an SSD employee (*See*, James' deposition, R. Doc. 40, p. 33), the evidence
submitted herein indicates that Parker was terminated because her actions presented a security concern
(which was also the underlying reason for the DCI ban).  *See*, R. Doc. 32-5, p. 46-49.  No evidence has
been presented indicating that security was not the reason for Parker's termination (*i.e.*, that such reason
was pretextual) and that the actual reason was Parker's race.

[20] While the DOE also asserts an argument that Parker's claims should be dismissed because it
did not actually make the decision to terminate Parker and such decision was made by the State Board of
Elementary and Secondary Education ("BESE"), the Court finds that such argument lacks merit.  The
DOE/SSD was Parker's employer and operates under the direction of BESE.  As indicated in Jenkins'
deposition, the SSD simply lacked the authority to hire and fire employees; such decisions were made by
the Superintendent and BESE, with input and recommendations from the SSD Director.  The Court agrees
with Parker that it would be unfair to dismiss her claims based solely on that technical ground since it
would leave her without redress to sue her employer for discriminatory acts under Title VII.

establish an inference of causation through temporal proximity because the placement of an employee on paid leave pending an investigation does not constitute an "adverse employment action," as is required for a retaliatory discharge claim. *Singletary v. Mo. Dep't of Corrs.*, 423 F.3d 886, 891-92 (8th Cir. 2005)(finding that corrections officer did not suffer materially adverse action when his employer placed him on administrative leave pending a departmental investigation).[21] [22]

## IV.   Parker's Motion to Deny the DOE's Motion for Summary Judgment or Defer Ruling on Same under Fed. R. Civ. P. 56(f):

Prior to filing her opposition to the DOE's summary judgment motion, Parker filed a Rule 56(f) motion to deny or defer ruling on that motion based upon the fact that her counsel had not yet had the opportunity to depose Jenkins and Deputy Warden Lorena. As discussed above, Parker argued that, through such deposition testimony, she would be able to "establish genuine issues of material fact concerning the reasons for defendant's termination of her employment and whether they are pretextual." However, prior to the Court ruling upon such motion to deny/defer, plaintiff's counsel was able to take the depositions of Jenkins and Deputy Warden Lorena and to rely upon them in Parker's

---

[21] *See also, Breaux v. City of Garland*, 205 F.3d 150, 157-58 (5th Cir. 2000)(Finding that a police officer did not suffer any adverse action by being required to undergo a psychological examination following an altercation with a colleague or by being placed on paid administrative leave when he retained his job and had not been demoted or transferred to a less desirable position); *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772 (7th Cir. 2007)(Officer's placement on paid administrative leave pending results of his fitness-for-duty psychological examinations was not a materially adverse employment action supporting a retaliation claim); *Von Gunten v. Md.*, 243 F.3d 858, 869 (4th Cir. 2001)(finding that an employer's placement of an employee on short administrative leave with pay to allow time for an internal investigation of a complaint was not an adverse action).

[22] Because the Court finds that Parker has not presented sufficient evidence to sustain her burden of proof on her hostile work environment and retaliatory discharge claims, it need not consider the DOE's additional arguments that Parker failed to exhaust her administrative remedies through her EEOC complaint and that she failed to report the alleged harassment to the DOE in accordance with its policies.

opposition to the DOE's motion for summary judgment filed on April 2, 2008. Considering that plaintiff's counsel has taken the two depositions that he indicated he needed in order to prepare an opposition to the DOE's summary judgment motion; that he has, in fact, filed an opposition to the DOE's motion;[23] and that he did not specifically identify any other depositions that Parker needs in this matter prior to the Court ruling upon the DOE's summary judgment motion, the Court finds that Parker's motion to deny/defer ruling on the summary judgment motion is moot and should be denied.

## V.    The DOE's attorney's fees request:

Pursuant to 42 U.S.C. §2000e-5(k), in any action or proceeding under Title VII, a court may, in its discretion, allow the prevailing party a reasonable attorney's fee (including expert fees) as part of the costs. 42 U.S.C. §2000e-5(k). Considering that summary

---

[23] The protection afforded by Rule 56(f) is an "alternative" to a response in opposition to a summary judgment under Rule 56(e). *Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 833 (10th Cir. 1986)(quoting 10A Wright, Miller & Kane, Federal Practice and Procedure §2740 (1983)). In order for a Rule 56(f) motion to be granted, a party must explain "why facts precluding summary judgment cannot be presented" and state, with specificity, how the desired time would enable the non-moving party to meet its burden in opposing summary judgment. *Jensen v. Redev. Agency*, 998 F.2d 1550, 1554 (10th Cir. 1993); *Tarantino v. Pierce.*, 149 F.3d 1174 (5th Cir. 1998)(A party seeking continuance of a motion for summary judgment in order to obtain further discovery must show "why he needs additional discovery and how the additional discovery will create a genuine issue of material fact. The nonmoving party 'may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts'"). Because Parker has obtained the two depositions identified in her motion and has filed an opposition to the DOE's summary judgment motion, the alleged basis for her "alternative" Rule 56(f) motion no longer exists.

*See, Salazar v. Christensen*, 2003 WL 23356434 (D.Utah 2003)(where the plaintiff stated in his Rule 56(f) motion that he needed to discover information about the defendant's relationship with Thrifty Nickel, and after the filing of the motion but prior to the ruling on the defendant's summary judgment, the plaintiff took the deposition of the defendant, the court found that the plaintiff's Rule 56(f) motion was moot); *Filiatrault v. Comverse Technology, Inc.*, 275 F.3d 131 (1st Cir. 2001)(where the plaintiff obtained the Rule 30(b)(6) deposition identified in his initial Rule 56(f) motion, a renewed request for further discovery, which was not explicit as to what additional discovery the plaintiff wished to pursue or why he wanted to pursue it, was denied); *Ferry v. BJ's Wholesale Club*, 2007 WL 4303723 (W.D.N.C. 2007)(where the plaintiff obtained the information sought through his Rule 56(f) motion and filed an opposition to the defendant's motion for summary judgment, the Rule 56(f) motion was denied as moot); *Martin v. Northfork Elec. Co-op, Inc.*, 2005 WL 2777032 (W.D.Okla. 2005)(denying Rule 56(f) motion where plaintiff had already responded to motion for summary judgment).

judgment should be granted in the DOE's favor on both of Parker's claims, the undersigned also recommends, in its discretion, that the DOE be awarded its reasonable attorney's fees incurred in defending against this action.

## **RECOMMENDATION**

For the above reasons, it is recommended that the Motion for Summary Judgment (R. Doc. 30) filed by defendant, the Louisiana Department of Education, Special School District, be **GRANTED**, that this matter be **DISMISSED WITH PREJUDICE**, and that the defendant be awarded its reasonable attorney's fees incurred in defending against this action pursuant to 42 U.S.C. §2000e-5(k).  It is further recommended that the Motion to Deny Motion for Summary Judgment or Defer Ruling on Same under Fed. R. Civ. P. 56(f) (R. Doc. 31) filed by plaintiff, Sharlene Parker, be **DENIED AS MOOT**.

Signed in chambers in Baton Rouge, Louisiana, May 12, 2008.

_____

 **MAGISTRATE JUDGE CHRISTINE NOLAND**